**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SHARON AULT, *et al.*, | ) | CASE NO. 1:13-CV-176 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| OBERLIN COLLEGE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |

This case is before the undersigned United States Magistrate Judge upon the

consent of the parties.  Before the Court are the motions for summary judgment filed by

Defendants Bon Appetit Management Company ("Bon Appetit"), Oberlin College

("Oberlin" or "College"), and Dean Holliday ("Holliday") (collectively, "Defendants").

(Doc. Nos. 59, 61, 64.)  For the reasons set forth below, Defendants' motions for

summary judgment are GRANTED.

## I.  BACKGROUND

**A.    Factual Background**

    **1.    Undisputed Facts**

This case arises out of allegations by Plaintiffs Sharon Ault ("Ault"), Kathy

Fenderson ("Fenderson"), Enola Bowen ("Bowen"),[1] and Carol Altenburger

---

[1] The Complaint and Amended Complaint list Bowen's first name as "Erola."
(Doc. Nos. 1-1, 31.)  In her deposition, however, Bowen testified that her first name is
"Enola." (Deposition of Enola Bowen ("Bowen Dep.") at 8:15-18, Doc. No. 59-6.)

("Altenburger")[2] that Defendant Holliday sexually harassed them during their employment as grill/cashier/counter cooks ("GCC") at Oberlin.  The following facts are not in dispute:

      a.    **Oberlin**

Oberlin's dining services department consists of four dining halls, as well as a retail store, a restaurant called the Rathskellar, and various other food service locations on the Oberlin campus.  (Declaration of Michele Gross ("Gross Decl.") at ¶ 2, Doc. No. 61-1.)  At the relevant times, Michele Gross was the director of dining and business operations at Oberlin.  (*Id*. at ¶ 1.)  The dining services department employs individuals in various positions, including grill/cashier/counter cooks ("GCCs").  (*Id*. at ¶ 4.)  Plaintiffs applied for their GCC positions through Oberlin's human resources department.  (Exhibits 3, 31, 65, and 84 to Plaintiffs' Depositions, Doc. No. 59-8 at 8-12, 208-11, 369-72, 432.)[3]  The GCC position, like other positions in the dining services department, is governed by a collective bargaining agreement between Oberlin and Local 2192 of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America ("Union" or "Local 2192").  (Gross  at ¶ 4.)

---

[2] Altenburger is named in the Complaint and Amended Complaint as Carol Reinhard. (Doc. Nos. 1-1, 31.)  During her deposition, however, Altenburger testified that she married Robert Altenburger and changed her name in October 2012, after the filing of the Complaint, but before the filing of the Amended Complaint in this matter. (Deposition of Carol Altenburger ("Altenburger Dep.") at 9:15-10:10, Doc. No. 59-4.)

[3] Bon Appetit filed the 90 exhibits used during Plaintiff's depositions in a voluminous single file, without any index or table of contents.  (Doc. No. 59-8.)  The page numbers used to refer to an exhibit contained in the file correspond to the numbers assigned by this Court's docket, *i.e.*, the page numbers that appear on the upper right side of the documents contained therein.

The collective bargaining agreement between Local 2192 and Oberlin contains a non-discrimination clause, which provides:

> Oberlin college covenants that it will not discriminate against any employee or applicant for employment because of race, creed, color, sex, sexual orientation, disability, or national origin.  Both the College and the Union shall comply with federal executive orders and state and federal laws requiring equal employment opportunities for call races.

(Exhibit 5 to Plaintiffs' Depositions, Doc. No. 59-8 at 46.)  The agreement also includes a grievance procedure, which outlines the steps required for a covered employee to file and pursue grievances.  (*Id*. at 43-44.)

Oberlin has enacted a Business Conduct Policy Manual, which each of the Plaintiffs received during their employment with Oberlin. (Exhibits 4, 33, 73 to Plaintiffs' Depositions, Doc. No. 59-8 at 13-14, 213-14, 391-92.).  The manual sets forth the procedure by which Oberlin employees may report discrimination, including sexual harassment.  (Exhibit 6 to Plaintiffs' Depositions, Doc. No. 59-8 at 89-96.)  The policy requires employees to file "complaints of discrimination and harassment . . . in writing . . . by e-mail" to Oberlin Special Assistant for Equity Concerns Camille Hamlin Allen.  (*Id*. at 90.)  In January 2008, Oberlin conducted mandatory training sessions for its employees, which addressed, *inter alias*, "[w]hat steps the College and the Union will take in resolving cases of work place harassment; [w]hat is your responsibility," and "management[']s responsibility."  (Exhibit 7 to Plaintiffs' Depositions, Doc. No. 59-8 at 117.)  All four Plaintiffs attended a mandatory training session in January 2008.  (Exhibit 8 to Plaintiffs' Depositions, Doc. No. 59-8 at 118-19.)  Additionally, at all relevant times, Oberlin maintained a Sexual Offense Policy, available in pamphlet form in human

3

resources, that defined sexual harassment and instructed "any member of the campus community who believes that his or her . . . work experience has been subjected to sexual harassment" to contact Allen.  (Exhibit 75 to Plaintiffs' Depositions, Doc. No. 59-8 at 395-96.)

### b.    Bon Appetit

Bon Appetit is "an on-site restaurant company" that offers "full food-service management to corporations, universities, museums, and specialty venues." (Declaration of Dan Farrell ("Farrell Decl.") at ¶ 1, Doc. No. 59-2.)  Since 2001, Bon Appetit has contracted with Oberlin to operate the college's on-site dining facilities.  (*Id*. at ¶ 2.)  At the relevant times, the Bon Appetit general manager assigned to Oberlin was Rick Panfil.  (Declaration of Rick Panfil ("Panfil Decl.") at ¶ 1, Doc. No. 59-3.) Panfil reported to Dan Farrell, the Bon Appetit district manager who oversaw the Oberlin account.  (Farrell Decl. at ¶ 1.)  Under the terms of the agreement, Bon Appetit provides a management team, consisting of a general manager, an executive chief, a sous chief and other managers, who "oversee Oberlin's food services program."  (*Id*. at ¶ 3.)  Defendant Holliday was the executive chief at Oberlin from September 2008 until September 2011.  (*Id*. at ¶ 5.)  Bon Appetit managers "monitor[] the production and quality of work of [Oberlin's] food service employees," but are limited to "preparing menus and coaching Oberlin employees on cooking techniques and food preparation." (*Id*. at ¶ 3.)  With respect to Oberlin employees, Bon Appetit has no authority to: hire or discharge; modify or transfer work assignments; affect rates of pay; or impose discipline.  (*Id*. at ¶ 7.)  Rather, where an Oberlin employee's conduct or work is not

4

satisfactory, Bon Appetit notifies Oberlin, and Oberlin determines whether discipline is warranted.  (*Id*.)  With respect to Oberlin employees, Gross is "responsible for making decisions pertaining to discipline, changes in rates of pay, assignments, hiring, firing, or promoting"

During the relevant time, Bon Appetit maintained a "zero tolerance" policy prohibiting discrimination and sexual harassment.  (Farrell Decl. at Ex. A, Doc. No. 59-2.)  The policy required Bon Appetit  employees to report harassment "using the Open Communication Policy," by reporting their concerns to their immediate supervisors, or, if they were uncomfortable reporting to their supervisors, to the next level of management. (*Id*.)  The policy also provided that employees could report harassment by calling one of two toll free numbers provided in the policy.  (*Id*.)

### c.    Plaintiffs Allege that Holliday Sexually Harassed Them

After a conversation in April 2011, Plaintiffs Ault, Altenburger and Fenderson contacted the office of Oberlin's Ombuds, Yeworkwha Belachew ("YB"), and reported that Defendant Holliday had sexually harassed them.  (Deposition of Sharon Ault ("Ault Dep.") at 198:22-199:14.)  They met with YB at least twice.  (*Id*. at 199:18-20.)  Although there is some dispute regarding what occurred at those meetings,[4] the parties agree that, eventually, YB arranged for a meeting between Plaintiffs and Allen, who was Oberlin's contact person for employees reporting sexual harassment, to take place on

---

[4] Plaintiffs contend that, at the final meeting, YB asked them whether they were engaging in a "witch hunt," and commented that they "must really fear for your jobs." (Altenburger Dep. at 123:3-11.)

5

April 29, 2011.  (Altenburger Dep. at 123:13-17; Doc. No. 63.[5])  Shortly before that meeting, Plaintiffs decided to cancel it and obtain legal representation instead. (Altenburger Dep. at 124:20-23.)

Nearly five months later, on September 21, 2011, attorney John Bacevice sent Oberlin a letter on behalf of Plaintiffs Ault, Altenburger and Fenderson, asserting that Holliday had sexually harassed Plaintiffs and outlining the specific allegations.  (Exhibit 12 to Plaintiffs' Depositions, Doc. No. 59-8 at 134-36.)  In the letter, Bacevice described Plaintiffs as "Oberlin employees working for the College's Food Services staff," and acknowledged that Holliday was "an employee of Bon Apetite [sic] contracted by Oberlin College for food service."  (Id.)

Immediately upon receipt of the letter, Gross contacted Panfil and requested that Bon Appetit remove Holliday from the campus.  (Gross Decl. at ¶ 10.)  That same day, Bon Appetit removed Holliday from Oberlin's campus.  (Farrell Decl. at ¶ 12.)  Both Oberlin and Bon Appetit conducted internal investigations of the accusations.  (Farrell Decl. at ¶ 13, Gross Decl. at ¶ 13.)  Oberlin ultimately determined that it could not substantiate the allegations, and notified Bon Appetit that Holliday could return to Oberlin.  (Farrell Decl. at ¶ 15.)  Holliday, however, did not return to his position at Oberlin.  (Farrell Decl. at ¶ 17.)  Rather, he continued working for Bon Appetit in a different capacity.  (Deposition of Dean Holliday ("Holliday Dep.") at 97:23-99:20.)

At the time of their March 2014 depositions, Altenburger and Fenderson

---

[5]  Document number 63 are e-mail messages between YB and Allen.  Oberlin filed these messages under seal.  In their pleadings, however, the parties generally refer to these e-mails and their recipients without revealing their contents.  Plaintiffs do not dispute that these e-mail messages are genuine.

continued to work as GCCs at Oberlin.  (Deposition of Kathy Fenderson ("Fenderson

Dep.") at 46:6-9; Altenburger Dep. at 56:23-58:5.)  Bowen and Ault retired in August

2010 and May 2013, respectively.  (Bowen Dep. at 40:12-13, Doc. No. 59-6; Ault Dep.

at 65:19-21, 99:3-4, Doc. No. 59-5.)

### d.    Fenderson's March 2013 Grievance

In March 2013, Fenderson filed a grievance alleging that she was being

"singled out" for mistreatment by Bon Appetit and Oberlin:

> Since opening Wilder [an Oberlin dining hall] after Christmas
> break 2013, [Fenderson] has been on the catering rotation
> and has repeatedly been set up for failure by management
> by not having all the catering information [and]
> misinformation she needed present on the catering sheets
> (invoice's [sic]) provide[d] by Bon Appetit, which is causing a
> very hostile work environment and making it extremely
> difficult to provide excellent service on numerous occasions.
> [Fenderson] is obviously being singled out by management
> and being penalized for the mistakes of the catering
> dep[artment], which is not her fault.

(Exhibit 39 to Plaintiffs' Depositions, Doc. No. 59-8 at 221.)  Although not entirely clear

from the record, in March 2013, Fenderson apparently received a verbal warning for

insubordinate language that was somehow related to the grievance.  (Id. at 223.)  In

August 2013, after the grievance process, Oberlin and the union settled the grievance,

with Oberlin agreeing to remove the verbal warning from Fenderson's file effective

December 2013 "provided there are no further incidents of disruptive behavior by her

before that time."  (Id.)

### 2.    Plaintiffs' Allegations of Sexual Harassment

Altenburger alleges five instances of sexual harassment by Holliday: (1) in

March 2011, in response to Altenburger asking whether there were any melon balls for watermelon gazpacho soup, Holliday asked Altenburger whether she wanted to "ride David Jones's (another Oberlin employee) balls" (Altenburger Dep. at 95:18-96:3, 340:18-341:1); (2) in spring 2011, Holliday told Katie Marquat, another Oberlin employee, that Marquat's children would have red hair "only if I (Holliday) f*** you" (*Id*. at 153:21-154:3);[6] (3) in summer 2011, when Altenburger asked another Oberlin employee whether she could use the calendar in that employee's office, Holliday interjected, saying, "Oh, come into my . . . office.  My calendar is much bigger" (*Id*. at 185:10-20); (4) an incident during which Holliday asked Altenburger whether she was "going down" in an elevator in a manner that Altenburger perceived as being sexual (*Id*. at 186:12-17, 343:14-344:3); and (5) an incident during which Holliday told Altenburger that, Chelsea Felty, another female Oberlin employee, dressed nicely because he "dress[ed] her" (*Id*. at 187:21-23).

Ault alleges three instances of sexual harassment by Holliday: (1) Holliday once implied to Ault that he had seen Felty naked, saying "Oh, believe me. I've seen it. She's skinny" (Deposition of Sharon Ault ("Ault Dep.") at 139:12-140:4); (2) after Ault bent down to pick something up at her station, Holliday asked her to bend over again (*Id*. at 137:13-17); and (3) Holliday looked at Ault's backside and commented, "Well, it looks pretty good back there too" (*Id*. at 138:9-22).

Fenderson alleges one incident of harassment.  According to Fenderson, in

---

[6] At deposition, Altenburger conceded that she did not actually hear the conversation between Marquat and Holliday, but that Marquat had told her about the comment later.  (Altenburger Dep. at 154:19-155:5.)

June 2010, she was placing items on a high shelf in a walk-in cooler.  (Fenderson Dep. at 194:9-12, 196:10-22, Doc. No. 59-7.)  Holliday entered the cooler and pressed himself against Fenderson in such a manner that she could not move away from him:

> [Holliday] came up behind me and got behind me and put his pelvic area – his penis up against my butt and put his chin and shoulder right here (indicating) where I could feel him breathing.  And I couldn't go forward because the rack was right there.
>
> And I said, ["]What are you doing?["] And I asked him – I said, ["]Back up off me.  What are you doing?["]
>
> And he kept standing there, and I couldn't go sideways or no other way, and my hand was still on the shelf.  And I said, ["]Back up off me.  Get up off me.  What are you doing?["]
>
> And he just stood there with his chin right here on my shoulder – my right shoulder here (indicating) and you could feel his breath on me and his penis was on me.  And I was trying to move forward, but I couldn't move forward, or I couldn't move backwards or sideways because I was trapped in there.  And I was saying, ["]Get up off me, back up off me.["]

(Fenderson Dep. at 196:2-22.)  According to Fenderson, Holliday moved away from her and walked away when Plaintiff Bowen opened the door to the cooler and saw what Holliday was doing.  (*Id*. at 196:23-197:2.)

During her deposition, Bowen testified that she witnessed the incident between Holliday and Fenderson in the cooler in June 2010.  (Bowen Dep. at 93:25 -107:10.) According to Bowen, she yelled at Holliday to stop, and then he "looked at me like I was a piece of something that a dog would leave on the ground, which made me take offense.  I was shocked of a manager doing something like that to an employee." (*Id*. at 55:17-21.)

9

## B.    Procedural Background

In December 2012, Plaintiffs filed their Complaint in state court.  (Doc. No. 1-1.) In January 2013, Oberlin removed the case to this Court, on the basis that Plaintiffs' claims against Oberlin are preempted by § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185.  (Doc. No. 1.)  Thereafter, the parties consented to the jurisdiction of the undersigned United States magistrate judge.  (Doc. No. 18.)

In August 2013, Plaintiffs filed their Amended Complaint against Defendants, which contained claims for: (1) sexual harassment, in violation of Ohio's anti-discrimination statutes, Ohio Revised Code §§ 4112, *et seq*. (Count One); (2) breach of contract (Count Two); (3) negligent hiring, supervision and retention (Count Three); (4) retaliation (Count Four); and (5) "severe emotional distress" (Count Five).  (Doc. No. 31.)[7]  The Amended Complaint, which also sought punitive damages, did not specify the particular Defendant against whom each count was brought.  (*Id*.)

In June 2014, the Defendants filed separate motions for summary judgment. (Doc. Nos. 59, 61, 64.) Plaintiffs filed their Opposition, and Defendants filed their Replies in support.  (Doc. Nos. 71-77.)  Accordingly, the motions for summary judgment are ready for review.

## A.    Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

---

[7] The Amended Complaint also named Oberlin President Marvin Krislov as a defendant, and alleged violations of Title VII.  (Doc. No. 31.)  In June 2014, however, the parties stipulated to the dismissal of all claims against Krislov and all Title VII claims.  (Doc. No. 55.)

Civ. P. 56(a).  The moving party can meet this burden in two ways:  by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must produce evidence that results in a conflict of material fact to be resolved by a jury.  *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  The court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact.  *Al-Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841, 845 (S.D. Ohio 2003) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)).  The nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely.  *Id.* (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).

In reviewing summary judgment motions, a court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990).  In addition, the Court does not weigh the evidence or make credibility determinations.  *Joostberns v. U. Parcel Servs., Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006).  The determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.

11

*Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to defeat a motion for summary judgment; there must be evidence on which the jury could reasonably find for the nonmoving party. *Id.* Ultimately, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52.

**B.** **Whether Defendants are Entitled to Summary Judgment on Plaintiffs' Chapter 4112 Claims**

**1.** **Whether the Alleged Conduct Was Sufficiently Severe or Pervasive to be Actionable Under Chapter 4112**

Plaintiffs assert claims under Ohio's civil rights statutes, which are set forth in Ohio Revised Code Chapter 4112.  These statutes prohibit discriminatory acts in relation to employment, including hostile work environment sexual harassment. *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 732, 89 Ohio St.3d 169, 176 (Ohio 2000).  Under Ohio law, plaintiff who alleges a claim of hostile work environment sexual harassment must establish that:

> (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

729 N.E.2d at 732-33, 89 Ohio St.3d at 176-77.  Ohio courts have long recognized that

"federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of" Ohio's civil rights statutes. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.e.2d 128, 131, 66 Ohio St.2d 192, 196 (Ohio 1981).

In this case, all three Defendants argue that Plaintiffs' allegations, even if true, do not describe conduct that is sufficiently severe or pervasive to be actionable under Chapter 4112. Generally, whether alleged conduct was sufficiently severe or pervasive is a fact specific inquiry, as the issue can be determined "only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hampel*, 729 N.E.2d at 735, 89 Ohio St.3d at 735 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The standard for judging the relevant conduct is "sufficiently demanding to ensure that" Ohio's anti-discrimination statutes do not become "a general civility code." *Harter v. Chillicothe Long-Term Care, Inc.*, No. 11CA3277, 2010 WL 1997821 (Ohio App. Ct. May 29, 2012) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)). Accordingly, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms of conditions of employment.'" *Faragher*, 524 U.S. at 788. Nor will "the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id*.

Plaintiffs Altenburger and Ault rely on similar types of conduct to support their

13

sexual harassment hostile work environment claims, specifically various comments made by Holliday throughout his tenure at Oberlin.  Altenburger points to five comments allegedly made by Holliday.  Ault points to three comments.  Neither Ault nor Altenburger contends that she found these comments physically threatening.  Nor do they contend that Holliday went beyond making verbal remarks.  The relevant case law compels the conclusion that these isolated comments – while uncouth and inappropriate – are not sufficient to satisfy the severe or pervasive requirement of Altenburger and Ault's claims.  Ohio courts and the Sixth Circuit have concluded that more egregious conduct was not, as a matter of law, sufficiently severe or pervasive to create a hostile work environment.  *See, e.g., Clay v. United Parcel Serv.*, 501 F.3d 695, 707 (6th Cir. 2007) (finding that fifteen incidents of harassing and insulting comments were not sufficient to satisfy the standard, as they were "mere offensive utterances" and were not actionable); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir. 2000) (finding that the plaintiff's allegation of three instances of misconduct, including one occasion during which her supervisor placed a pack of cigarettes inside the plaintiff's brassiere strap, were not sufficiently severe or pervasive to be actionable); *Gatsios v. Timken Co.*, No. 2011CA00185, 2012 WL 2389664, *7 (Ohio App. Ct. June 25, 2012) (in an ancestry-based hostile work environment claim, finding that multiple inappropriate comments were "off-hand [and] isolated" and "failed to alter any term or condition" of the plaintiff's employment).

Further, neither Ault nor Altenburger testified at deposition that the alleged comments by Holliday interfered with her ability to perform her job.  *See Armaly v. City of Wapakoneta*, No. 2-05-45, 2006 WL 1976191, * 8 (Ohio App. Ct. July 17, 2006)

14

(finding that unwanted personal e-mails and expressions of affection and love received by the plaintiff from her supervisor were not sufficient to satisfy the "severe or pervasive" standard because the plaintiff did not demonstrate that the conduct interfered with her ability to do her job or otherwise affected her performance).  Indeed, Altenburger testified that her work product remained the same even after Holliday made the offensive comments.  (Aultenburger Dep. at 213:4-214:8, Doc. No. 59-4.)

In their opposition, Plaintiffs argue that Ault chose to retire "because of the environment," and, thus, Holliday's conduct interfered with her ability to perform her work  (Pl. Opp. to Bon Appetit's Summary Judgment Motion at 17,[8] Doc. No. 71.)  This argument, however, relies on a mischaracterization of Ault's testimony.  During her deposition, Ault testified that, although she had officially retired from Oberlin in March 2013, she had actually taken medical leave in November 2012 and had chosen not to return because she "did not want to suffer at the hands of [Holliday's] followers."  (Ault Dep. at 218:17-18.)  Plaintiffs contend that this testimony is evidence that Ault retired because of the sexually harassing environment.  Further review of Ault's deposition testimony, however, reveals that her comment was actually a description of how she perceived the attitude of other Oberlin employees who disagreed with Holliday's removal from the campus:

> Q:     Now, when you say you didn't want to suffer at the hands of his followers, what specifically did you mean by that?

---

[8] Plaintiffs did not number the pages in their briefs in opposition.  Accordingly, this Order refers to the page numbers assigned by the Court's electronic filing system, located at the top of each page.

A:     Well, he had certain people that either he hired or I'm going to go back to the women in the kitchen that enjoyed his touchy-feely sessions, and these are the same women who are wicked.  You have no idea how you can be treated in there – you don't want to go to work.  You're in tears on the way there.

*   *   *

Q:     Was the reason that you decided that you were going to retire from Oberlin was that you didn't want to come back because of the repercussions that you alleged existed by virtue of your complaints against Dean Holliday, or you still had issues with these women who were bullying you as far back as 1997?

A:     1997 has nothing to do with what Dean did.  And these are the women who enjoyed his advances.  They disliked me, so, yes.  They're going to give me a hell of a way to go.

Q:     So it was a combination?

A:     Combination nothing.  I would have stayed away from him as much as I could, but they're going to dislike me even more knowing this is going on and liking Dean.

Q:     Did you ever hear of anything from Saundra Alston [an employee whom Ault had referred to as loyal to Holliday and whom Ault alleged had bullied her in the past] regarding Dean Holliday?

A:     Did I, no.  I don't speak to her.

Q:     So she never mentioned anything to you about your complaints against Dean Holliday?

A:     No.

*   *   *

Q:     Did you ever speak to Jeanie Speicher [another Oberlin employee whom Ault said had bullied her in the past] concerning your complaints against Dean

16

Holliday?

A:      No.

Q:      So you just assumed, then, that these women would
        be on you by virtue of your complaints against Dean
        Holliday?  They never said anything to you about it,
        did they?

A:      They don't have to say anything to me.

(Ault Dep. at 221:3-223:16.)  Ault's testimony indicates that she chose to retire rather

than experience what she assumed would be mistreatment from Holliday's "supporters."

Accordingly, the record does not support the contention that Holliday's conduct forced

Ault to leave Oberlin and eventually retire.  There is no evidence in the record that

Holliday's conduct otherwise interfered with Ault's ability to work.  The sporadic, isolated

comments upon which Ault and Altenburger rely do not rise to the level of "severe or

pervasive" required for a plaintiff to succeed under Chapter 4112, particularly in the

absence of evidence that the conduct interfered with their ability to perform their jobs.

Accordingly, as a matter of law, Ault and Altenburger cannot satisfy the *prima facie*

case for sexual harassment hostile work environment and Defendants are entitled to

summary judgment on Ault and Altenburger's claims under Chapter 4112.[9]

        Fenderson's allegation is a closer question in this case.  Although she alleges

only a single incident of specific conduct, the alleged conduct consisted of an unwanted

invasion of her personal space and uninvited physical contact, during which she could

---

[9] Plaintiffs fail to cite a single case, state or federal, finding that conduct similar to
the conduct at issue here constituted actionable sexual harassment.  Rather, Plaintiffs
reiterate the allegations and make the conclusory assertion that Holliday's conduct was
sufficiently severe and pervasive to constitute sexual harassment in violation of Chapter
4112.

17

feel Holliday's genitals against her backside and his breath on her shoulder and was unable to move away from him.  This behavior is far more extreme than the conduct alleged by the other plaintiffs.  Courts in this Circuit, however, have determined that a single instance of physical contact, particularly where there is no evidence that the harassment unreasonably interfered with the plaintiff's work performance, is not sufficient to constitute actionable harassment.  *See, e.g., Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464-65 (6th Cir. 2000) (concluding that plaintiff's allegations that, throughout a four-year period, his direct supervisor had rubbed his shoulders on one occasion and, on another, had "grabbed his buttocks" and told him, "'she controlled" his "'ass and she would do whatever she wanted with it,'" were not "severe or pervasive enough to constitute a hostile environment"); *Moorer v. Summit County Dep't of Jobs and Family Servs,*, No. 5:10-CV-457, 2011 WL 2746098, *8 (N.D. Ohio July 14, 2011) ("And while Defendant Ladd's touching of Plaintiff's backside is totally inappropriate, this isolated incident, even coupled with other alleged incidences and comments, does not rise to the level of severity outlined by the Sixth Circuit."); *Garcia v. ANR Freight Sys, Inc.*, 942 F. Supp. 351, 356 (N.D. Ohio 1996) (where the harassment included a co-worker grabbing the back of plaintiff's head and guiding it toward his lap, and brushing his hand against her breast, finding that the plaintiff's claim failed because "based on the totality of the circumstances, plaintiff has not shown that pervasive, severe harassment over the course of her entire Toledo employment created an abusive environment that unreasonably interfered with or altered her employment").  Fenderson does not allege that Holliday harassed her in any other way during his

18

tenure at Oberlin.  Nor do Plaintiffs point to any evidence that the June 2010 incident unreasonably interfered with Fenderson's ability to perform her job, or otherwise altered the conditions of her employment.  *See Rayford v. Ill. Cent. R.R.*, 489 F. App'x 1, 5 (6th Cir. 2012) (rejecting the plaintiff's sexual harassment hostile work environment claims, noting that, "while [the plaintiff] testified that he had difficulty concentrating at times, he also testified he was able to work regularly and continuously and perform his job duties").  Accordingly, Fenderson's claim of sexual harassment hostile work environment under Chapter 4112 fails as a matter of law.

Bowen's claim relies upon her witnessing the June 2010 incident between Fenderson and Holliday, and her claim that, after she yelled at Holliday to stop, he "looked at [her] like [she] was a piece of something that a dog would leave on the ground, which made [her] take offense."  (Bowen Dep. at 55:17-21.)  Given the case law discussed above, as well as the absence of evidence that the alleged conduct unreasonably interfered with Bowen's ability to perform her job or otherwise altered her employment, these allegations are not sufficiently severe or pervasive to be actionable under Chapter 4112.  Accordingly, Bowen's claim under Chapter 4112 fails as a matter of law.

Finally, in their opposition to the motions for summary judgment, Plaintiffs contend, for the first time, that their claims rely upon the conduct of individuals other than Holliday.  Specifically, they argue that an "old boys club" in dining services created an atmosphere that was permeated with sexual conversations, innuendo, jokes and teasing.  To support these allegations of widespread misconduct and harassing behavior, Plaintiffs principally rely on the testimony of Joan Higgins, a witness identified

19

by Plaintiffs and deposed by Defendants, who used the term twice during her deposition. (Deposition of Joan Higgins ("Higgins Dep.") at 43:14-16, 44:17-18, Doc. No. 74.)  Her testimony, however, was vague and nonspecific.  Although Higgins testified that Holliday and others made sexual comments about the students at Oberlin, she did not have any firsthand knowledge of any such conduct occurring in the Plaintiffs' presence.  (*Id*. at 60:1-23.)  She could not recall the specific comments that Holliday allegedly made, or the individuals to whom he made them.  (*Id*. at 43:16-22, 46:1-9.)  In sum, Higgins's testimony is not sufficient to create a genuine issue of material fact with respect to whether the conduct to which Plaintiffs refer was sufficiently severe or pervasive to be actionable under Chapter 4112.  *See, e.g., E.E.O.C. v. Spitzer Mgmt., Inc.*, 866 F. Supp.2d 851, 857 (N.D. Ohio 2012) (finding that a co-worker's testimony regarding comments he heard the defendant make to the plaintiffs could not support their claims of hostile work environment where the co-worker "cannot recount the frequency of these comments and could only recall in vague terms the specific words" used by the supervisor).  Rather, Higgins's testimony described "the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing" that courts have specifically determined are not sufficient to constitute actionable harassment. *Faragher*, 524 U.S. at 788. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims under Chapter 4112.

### 2. Whether Bon Appetit is Entitled to Summary Judgment on Other Grounds

Bon Appetit argues that, even if the relevant conduct was sufficiently severe or

pervasive to be actionable under Chapter 4112, it is entitled to summary judgment because Bon Appetit was not the Plaintiffs' employer.  The company also argues that, even if it did employ the Plaintiffs, because Bon Appetit had a policy regarding sexual harassment and Plaintiffs failed to avail themselves of that policy, it is entitled to an affirmative defense from liability.  These arguments are well taken.

### a.  Whether Bon Appetit was Plaintiffs' Employer

Chapter 4112 imposes liability for sexual harassment on "employers."  Ohio Rev. Code § 4112.02.  Bon Appetit argues that Plaintiffs were employees of Oberlin, rather than Bon Appetit and, thus, Bon Appetit cannot be liable to Plaintiffs for sexual harassment under Chapter 4112.  Plaintiffs do not dispute that they were employees of Oberlin during the relevant period of time.  They argue, however, that Bon Appetit and Oberlin were their joint employers and, thus, Bon Appetit is liable under Chapter 4112.  This argument lacks merit.

Under Ohio law, two entities may be considered joint employers where "upon review of their intercorporate relationship, one exercises a degree of control that exceeds the control normally exercised by a parent corporation over its separate and distinct subsidiary corporation."  Wilmot v. Forest City Auto Parts, No. 795945, 2000 WL 804616, *3 (Ohio App. Ct. June 22, 2000)  In determining whether two entities are joint employers, Ohio courts consider "(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control."  Id.

Here, Plaintiff's conclusorily assert that Bon Appetit and Oberlin were their joint employers.  They do not, however, point to any evidence in the record to support this

contention.[10]   Indeed, the record reveals no evidence that satisfies the elements of the

relevant analysis.  There is no dispute that Oberlin contracted with Bon Appetit for the

operation of Oberlin's food service facilities.  There is no evidence that Bon Appetit and

Oberlin share common management.  Rather, Bon Appetit has its own management

team that oversees the company's operations at Oberlin.  (Panfil Decl. at ¶ 3.)  Gross,

an Oberlin employee, supervises the operations of Oberlin's dining halls and food

service retail outlets.  (Gross Decl. at ¶ 1.)  Further, Plaintiffs point to no evidence that

Bon Appetit and Oberlin shared control of Oberlin employees.[11]   Rather, Holliday

testified at his deposition that he had no authority to discipline Oberlin employees.

(Holliday Dep. at 2822-29:5.)  Farrell states that Bon Appetit personnel had no control

over the discipline, schedules, pay, work assignments, hiring or firing of Oberlin

---

[10] Plaintiffs contend that, under the reasoning of the Ohio Supreme Court in *Genaro v. Central Transp., Inc.*, 703 N.E.2d 782, 84 Ohio St.3d 293 (Ohio 1999), Bon Appetit was their employer because it was acting "in the furtherance of the business of Oberlin College by running their food services."  (Doc. No. 71 at 12-13.)  In *Genaro*, however, the Ohio Supreme Court determined that, under Chapter 4112, an individual supervisor could be jointly and severally liable with his employer for discriminatory conduct.  The Ohio Supreme Court did not consider the issue of whether an independent contractor, such as Bon Appetit, becomes the employer of its customer's employees by virtue of providing that customer with a particular service.  Accordingly, Plaintiffs' reliance on *Genaro* for this point is misplaced.

[11] In their briefs, Plaintiffs assert that, during his deposition, Holliday conceded that he could discipline Oberlin employees.  Plaintiffs do not identify the evidentiary support for this contention.  Review of Holliday's deposition reveals that Plaintiffs are likely referring to a moment during his deposition when Plaintiffs' counsel showed Holliday what was purported to be a "progressive discipline document" from March 2014, which named a different individual, whom Holliday agreed was a Bon Appetit employee, as Altenburger's "supervising manager."  (Holliday Dep. at Ex. 2, Doc. No. 59-9.)  When asked whether this document – which was unsigned and had not been previously produced to Defendants during discovery – changed his testimony that he could not discipline Oberlin employees, Holliday responded, "no."  (*Id.* at 91:19-94:2.)  Accordingly, the record does not support Plaintiffs' contention.

employees.  (Farrell Decl. at ¶ 7.)   There is no dispute that the terms and conditions of

Plaintiffs' employment were set forth in the collective bargaining agreement between

their union and Oberlin, an agreement to which Bon Appetit was not a party.  (Exhibit 5

to Plaintiffs' Depositions, Doc. 59-8 at 15-86.)  Finally, the record is devoid of any

evidence of common ownership or financial control between Oberlin and Bon Appetit.

Accordingly, Plaintiffs cannot demonstrate a genuine issue of material fact regarding

whether Oberlin was their sole employer, and Bon Appetit is entitled to summary

judgment on Plaintiffs' Chapter 4112 claims on this basis as well.

### b.    Whether Bon Appetit is Entitled to the Affirmative Defense

Bon Appetit also argues that, even if it was Plaintiffs' joint employer, it would be

entitled an affirmative defense to liability because Plaintiffs failed to avail themselves of

Bon Appetit's policy for reporting and addressing claims of sexual harassment.  This

argument is well taken.

Ohio courts have adopted the affirmative defense set forth in *Farragher*, *supra*,

and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1984), which requires an employer

to prove, by a preponderance of the evidence, that: (1) the employer exercised

reasonable care to prevent and correct sexual harassment; and (2) the plaintiff

unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer.  *Starner v. Guardian Indus.*, 758 N.E.2d 270, 282-83, 143

Ohio App.3d 461, 477-78 (Ohio App. Ct. 2001) (citing *Farragher*, 524 U.S. at 807-08;

*Ellerth.*, 524 U.S. at 765.)  Bon Appetit argues that it has a policy intended to prevent

and address sexual harassment in the workplace; that none of the Plaintiffs notified

23

Bon Appetit of Holliday's conduct; and, thus, it is entitled to the affirmative defense.

Plaintiffs do not dispute that they failed to complain directly to any Bon Appetit managers about Holliday's conduct.  Nor do they dispute that Bon Appetit had a policy to prevent and address sexual harassment.  Rather, Plaintiffs contend that the affirmative defense is inapplicable to Bon Appetit because, as their joint employer with Oberlin, Bon Appetit was put on notice of the conduct when Plaintiffs notified Oberlin's ombudsperson of their complaints against Holliday.  This Court, however, has already determined that Bon Appetit and Oberlin were not the Plaintiffs' joint employers. Plaintiffs also contend that Bon Appetit was on notice of the conduct because "it happened right in their own shop – the kitchens." (Doc. No. 71 at 13.) This argument fails for two reasons.  First, Plaintiffs have not offered evidence that Holliday's conduct was "so pervasive as to warrant an inference that the employer had actual knowledge or to charge the employer with constructive knowledge" of the harassment.  *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2012).  Second, the record reflects that, once Bon Appetit was notified of Plaintiffs' allegations against Holliday – in September 2012 when Oberlin notified Bon Appetit of the letter sent by Plaintiffs' then-counsel – Bon Appetit took immediate action: it removed Holliday from the campus. Both Ohio courts and the Sixth Circuit have declined to find constructive knowledge of harassment where the record reveals that the employer took immediate corrective action once notified of the offending conduct.  *See, e.g., Davis v. Monsanto Chem. Co.*, 858 F. 2d 345, 350 (6th Cir. 1988); *Austin v. United Dairy Farmers*, No. 17707, 1999 WL 1034438, *7 (Ohio App. Ct. Nov. 12, 1999).  Finally, Plaintiffs contend that, other than removing Holliday from the Oberlin campus, Bon Appetit took no further corrective

steps.  The record does not support this argument, as, in his declaration, Farrell contends that Bon Appetit conducted its own internal investigation of Plaintiffs' complaints.  (Farrell Decl. at ¶ 13, Doc. No. 59-2.)  Plaintiffs point to no evidence contradicting Farrell's statement or otherwise demonstrating that Bon Appetit failed to conduct an investigation into their allegations.  Accordingly, Bon Appetit is entitled to summary judgment on Plaintiffs' claims under Chapter 4112 on this basis as well.

### 3.    Whether Holliday is Entitled to Summary Judgment on Other Grounds

Holliday argues that, to the extent that the alleged misconduct was sufficiently severe and pervasive to constitute actionable harassment, he cannot be individually liable under Chapter 4112 because he was not Plaintiffs' supervisor.  Plaintiffs contend the opposite.  Plaintiffs' argument is not well taken.

Under Ohio law, "a supervisor/manager may be held joint and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of" Chapter 4112.  *Genaro*, 703 N.E.2d at 787-88, 84 Ohio St.3d at 300.[12]  Ohio courts have declined to extend *Genaro* to non-supervisory employees.  *See, e.g., Hale v. City of Dayton*, No. 18800, 2002 WL 191588, at *2 (Ohio App. Ct. Feb. 8, 2002); *Hoon v. Superior Tool Co.*, No. 79821, 2002 WL 93422, at *5 (Ohio App. Ct. Jan. 24, 2002).  Although the Ohio Supreme Court has not defined "supervisor" for the purposes of

---

[12] For the purposes of this Order, this Court assumes, without deciding, that Ohio courts would apply *Genaro* to find individual liability where the supervisor was employed by a different entity than the plaintiff.  No Ohio court has addressed this issue.  In this case, however, because Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to whether Holliday was their supervisor for purposes of Chapter 4112, this Court need not decide the question.

Chapter 4112 liability, at least one court in this Circuit has applied the reasoning of the United States Supreme Court's decision in *Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434 (2013), to determine whether an individual constituted a supervisor for purposes of liability under Chapter 4112.  *See Braun v. Ultimate Jetcharters, Inc.*, No. 5:12-cv-1635, 2013 WL 3873238 (N.D. Ohio July 25, 2013) (Lioi, J.).  Holliday relies on *Vance* in his summary judgment motion, and Plaintiffs do not dispute that *Vance* provides the appropriate analysis to determine whether Holliday was their supervisor in this case.  Accordingly, this Court will apply the reasoning of *Vance* to determine this issue.

In *Vance*, the Court held that a supervisor is an individual "empowered . . . to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 133 S. Ct. at 2443 (quoting *Ellerth.*, 524 U.S. at 761.)  In this case, the record is replete with evidence that Holliday had no authority to take tangible employment actions against Plaintiffs.  Farrell, Bon Appetit's district manager, specifically averred that Bon Appetit – Holliday's employer – had "no authority to hire or fire Oberlin College employees; modify or transfer their work assignments; affect their rates of pay; or otherwise affect the terms and conditions of their employment."  (Farrell Decl. at ¶ 7.)  Further, the company has "no authority to discipline" employees of Oberlin, but, rather, "advises" Oberlin of Oberlin employees' misconduct or poor performance.  (*Id.*)  Holliday testified that, while he was a supervisor of other Bon

26

Appetit employees, he could only "coach" Oberlin employees:

> Q:     Did you supervise the work of Oberlin College
>        employees?
>
>                            *  *  *
>
> A:     I coached them.
>
> Q:     What does coaching mean?
>
> A:     Explaining what needs to be done and how to do it.
>
> Q:     Would you correct them when they made a
>        mistake?
>
> A:     I would make them aware that something needed to
>        be different.
>
> Q:     And they would have to do that thing that needed to
>        be different, correct?
>
> A:     No.
>
> Q:     If they didn't, what would happen?
>
> A:     Like I said before, I could document it and I could
>        report it to my manager.

(Holliday Dep. at 66:18-67:5, Doc. No. 59-9.)  Holliday testified that he had no

responsibility for scheduling Oberlin employees, or for determining their work

assignments.  (*Id*. at 116:2-25.)  Rather, his primary responsibilities during his tenure at

Oberlin were "creating menus, financial responsibilities with reporting, [and the]

scheduling of managers and other chefs" who were Bon Appetit employees  (*Id*. at

17:20-23; 117:17-18.)

Plaintiffs point to no evidence that Holliday had the ability to take tangible

employment actions against them.  Rather, they conclusorily assert that "the facts and

27

Holliday's own admissions clearly depict him in his role as a supervisor."  (Pl's Opposition to Holliday's Summary Judgment Motion, Doc. No. 72 at 33.)  Plaintiffs do not, however, identify which facts confer supervisory liability on Holliday.  To the extent that Plaintiffs argue that Holliday's "coaching" of Plaintiffs is sufficient to render him a supervisor for the purposes of Chapter 4112, that argument fails.  Although Holliday's description of "coaching" suggests that he provided instruction or direction to Oberlin employees with respect to specific tasks, "[t]he ability to direct another employee's tasks is simply not sufficient" to impose supervisor liability.  *Vance*, 133 S. Ct. at 2448. Nor is the fact that Holliday could "document" an Oberlin employee's misconduct, despite the fact that, presumably, Holliday's documentation of misconduct could culminate in discipline.  *See Stanley v. Northwest Ohio Pscyh. Hosp.*, ___ F. Supp.2d ___, 2014 WL 1154272 (N.D. Ohio Mar. 21, 2014) (Helmick, J.) (finding that the fact that an employee could "*begin* a disciplinary process" was insufficient to render him a supervisor where "the ultimate responsibility regarding disciplinary matters belonged to individuals with higher authority") (emphasis in original). The record is entirely devoid of evidence that Holliday wielded the type of authority contemplated in *Vance*.  Absent evidence that Holliday could take actions that had "'direct economic harm'" on the Plaintiffs, *Vance*, 133 S. Ct. at 2448 (quoting *Ellerth*, 524 U.S. at 762), there is no genuine dispute regarding his status as a non-supervisor, and Holliday is entitled to summary judgment on Plaintiffs' Chapter 4112 claims on this basis.[13]

---

[13] Plaintiffs argue that Holliday satisfies the definition of "supervisor" under Section 301 of the Labor Management Relations Act.  (Doc. No. 72 at 34.)  This argument is unavailing.  Plaintiffs point to no authority holding that an individual who is a supervisor under the definition set forth in § 301 is also a supervisor for purposes of

28

### 4.    Whether Oberlin is Entitled to Summary Judgment on Other Grounds

Under Ohio law, an employer may be liable for sexual harassment committed by a plaintiff's co-worker where "the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hampel v. Food Ingredient Specialties, Inc.*, 729 N.E.2d 726, 733, 89 Ohio St.3d 169, 177 (Ohio 2000).  In this case, Oberlin argues, *inter alia*,[14] that, because Holliday was Plaintiffs' co-worker, rather than their supervisor, Oberlin is liable for sexual harassment only if the college knew or should have known that the harassment was occurring, and failed to take corrective action.  According to Oberlin, the college took such action immediately upon receiving notice of the

liability under Chapter 4112.

[14] Oberlin raises it own independent arguments in support of finding that Holliday lacked supervisory authority over Plaintiffs.  This Court's reasons for finding, in the context of Bon Appetit's arguments, that Holliday was not Plaintiffs' supervisor apply with equal force to the issue in the context of Oberlin.

Oberlin also argues that all of Plaintiffs' claims, including their Chapter 4112 claims, are preempted by the Labor Management Relations Act because the terms of and conditions of Plaintiffs' employment were governed by the collective bargaining agreement between the Plaintiffs' union and Oberlin.  Oberlin devotes a substantial portion of its briefing to this argument.  The case law on the relevant issues, however, is not settled in this Circuit.  Nor is the record sufficiently developed with respect to this issue.  Accordingly, and because the Court's resolution of other issues in the case disposes of all of Plaintiffs' claims, this Court declines to decide the preemption issue in this matter.  Although the remaining claims and arguments assert issues of state law, this Court exercises its discretion to assert supplemental jurisdiction over the state law claims in this case, as the parties have completed discovery and fully briefed the state law issues in this Court.  *See* 28 U.S.C. § 1367; *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (The decision whether to exercise supplemental jurisdiction depends on "judicial economy, convenience, fairness, and comity.")

allegations in September 2011.  Plaintiffs contend that, to the extent that Holliday was not their supervisor, because they reported Holliday's behavior to YB in April 2011 and Oberlin failed to take corrective action at that time, Oberlin is liable for Holliday's sexual harassment.

The facts in this case make this question a close one.  There is no dispute that the Plaintiffs contacted YB in April 2011 and accused Holliday of sexually harassing them.  There is also no dispute that, in the following weeks, YB set up a meeting between the Plaintiffs and Allen, the contact person for Oberlin employees alleging sexual harassment under Oberlin's policy.  Plaintiffs do not dispute that they cancelled this meeting.  Oberlin argues that, because Plaintiffs went to YB instead of Allen, and then cancelled the meeting with Allen, their contact with YB was not sufficient to put Oberlin on notice of the harassment as of April 2011.  Oberlin's argument, however, is unavailing, for two reasons.

First, Oberlin has failed to establish that contact with the ombudsperson was insufficient to constitute notice to Oberlin.  Oberlin contends that contacting YB was not sufficient to put Oberlin on notice because, as Oberlin's ombudsperson, YB's policy was to "refer matters of harassment . . . to the appropriate policy administrator."  (Doc. No. 61 at 29.)  Oberlin states that the ombudsperson "enjoys independence and has a duty to confidentially preserve information it receives from faculty, staff and students."  (*Id.*)  To support this contention, Oberlin cites to a sealed exhibit, which is the report that resulted from the independent investigation of Plaintiffs' allegations obtained by Oberlin.  (Sealed Doc. No. 62.)  That report contains a general description of the ombudsperson's duties and role at Oberlin, as related by YB to the author of the report.

30

(*Id*.) That report, however, is likely hearsay, as the author merely repeats YB's description of her office in the report. *See* Fed. R. Evid. 801(c). Oberlin offers no argument that the report falls within one of the hearsay exceptions. Oberlin provides no admissible evidence describing the role of the ombudsperson. There is no affidavit from YB or from someone else at Oberlin qualified to describe the functions – and limitations – of the ombudsperson's office. Further, Oberlin offers no evidence or legal authority establishing that the independence of the ombudsperson's office was such that Plaintiffs' complaints to YB were insufficient to put Oberlin on notice in April 2011.

Second, there is evidence that, in arranging the meeting between Plaintiffs and Allen, YB notified the individuals at Oberlin who were charged with responding to complaints of sexual harassment. The e-mails filed under seal reflect that YB communicated with Allen and Eric Estes – another individual contact person listed in Oberlin's policy – regarding Plaintiffs' allegations. The e-mail messages are brief and general. They do not name the Plaintiffs; nor do they describe their allegations. The messages, however, state that three Oberlin employees were complaining about sexual harassment. Oberlin offers no legal authority regarding whether general information such as that related by YB was sufficient to put Oberlin on notice of the sexual harassment. This Court is doubtful that YB's e-mail correspondence with Allen and Estes is sufficient to do so. Given, however, that this Court must consider the evidence in the light most favorable to the Plaintiffs, and must make every inference in their favor, there is arguably a question for the jury regarding whether the Plaintiffs' complaints to YB and YB's subsequent contact with Allen and Estes were sufficient to put Oberlin on notice of the sexual harassment in April 2011.

Oberlin also contends that, to the extent that the Plaintiffs' allegations describe actionable sexual harassment, Oberlin is entitled to the *Ellerth/Faragher* affirmative defense because it had a sexual harassment policy and Plaintiffs failed to take advantage of that policy.  This issue is also a close question in this case.  There is no dispute that Oberlin had a policy that is intended to prevent and address sexual harassment.  Oberlin asserts that Plaintiffs failed to comply with that policy, particularly once they cancelled the meeting with Allen.  Plaintiffs contend, however, that they cancelled that meeting and discontinued the reporting process at Oberlin because YB made comments that suggested that Plaintiffs' jobs were in jeopardy as a result of their allegations.  An employee's "subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment."  *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008).  However, a "credible threat of retaliation" may constitute a reasonable basis for an employee's failure to comply with her employer's sexual harassment policy.  *Id*; *see also Weger v. City of Ladue*, 500 F.3d 710, 725 (8th Cir. 2007).  The only evidence in the record disputing Plaintiffs' contention is the report of the independent investigator, which contains the author's statement that YB "categorically denied" the Plaintiffs' allegations that she had threatened their jobs.  (Sealed Doc. No. 62.)  Given this factual dispute, and taking the evidence in the light most favorable to the Plaintiffs, there is arguably a question for the jury regarding whether Plaintiffs' failure to comply with Oberlin's sexual harassment policy was unreasonable.  *See Starner*, 758 N.E.2d at

32

282-83, 143 Ohio App.3d at 477-78.[15]

The record reveals genuine issues of material fact regarding whether Oberlin was on notice of Plaintiffs' allegations in April 2011, and whether Plaintiffs' failure to comply with Oberlin's sexual harassment policy was unreasonable.  These factual disputes, however, do not merit the denial of Oberlin's motion for summary judgment on Plaintiffs' Chapter 4112 claims.  As discussed above, this Court has determined that Plaintiffs do not allege conduct that was sufficiently severe or pervasive to constitute actionable harassment.  Accordingly, despite the factual disputes regarding the issues of notice and Plaintiffs' compliance with the policy, Oberlin is entitled to summary judgment on Plaintiffs' Chapter 4112 claims.

### 5.    Whether there is Evidence of Retaliation

Plaintiffs contend that Defendants retaliated against Fenderson by issuing her a verbal warning for insubordinate language after she filed suit in this case.  (Doc. No. 73 at 35.)[16]  Under Ohio law, where, as here, a plaintiff alleges retaliation based on

_____

[15] Oberlin also argues that Plaintiffs unreasonably failed to file grievances regarding the alleged conduct.  This argument is unavailing.  Although Plaintiffs testified that they were aware of the grievance procedure and had used it to address other workplace issues, Oberlin offers no evidence that the filing of a grievance would have satisfied the college's sexual harassment policy.  Accordingly, the issue Plaintiffs' failure to file grievances is not relevant to the analysis of the *Ellerth/Faragher* affirmative defense.

[16] In their Amended Complaint, all four Plaintiffs assert claims of retaliation.  (Doc. No. 31.)  In their briefs in opposition, however, Plaintiffs dispute Defendants' arguments in support of summary judgment only with respect to Fenderson.  To avoid summary judgment after the movant has met its burden, a plaintiff must set forth specific facts in the record *demonstrating* a dispute of material fact.  Fed. R. Civ. P. 56(c), (e); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Plaintiffs do not set forth specific facts demonstrating a genuine dispute regarding the retaliation claims of Ault, Altenburger and Bowen and, thus, Defendants

33

circumstantial evidence, the plaintiff bears the initial burden of establishing a prima facie case of retaliation by showing that: (1) she engaged in a protected activity; (2) her employer was aware of her activity; (3) the employer took an adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse action. *Smith v. Dep't of Public Safety*, 997 N.E.2d 597, 611, 2013-Ohio-4210, ¶ 48 (Ohio App. Ct. 2013). If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse employment action. 997 N.E.2d at 611, 2013-Ohio-4210 at ¶ 49. If the employer does so, "the plaintiff's burden to prove pretext merges with the plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully retaliated." 997 N.E.2d at 612, 2013-Ohio-4210 at ¶ 50.

Fenderson's claims of retaliation against Bon Appetit and Holliday fail as a matter of law. This Court has already determined that Bon Appetit was not her joint employer, and that Holliday had no supervisory authority over her. To the extent that either of these defendants was her employer or supervisor, she offers no evidence that either Bon Appetit or Holliday took any adverse employment action against her. Accordingly, Fenderson cannot satisfy her initial burden of demonstrating a prima facie case of retaliation in this matter. Bon Appetit and Holliday are entitled to summary judgment on Fenderson's claims of retaliation under Chapter 4112.

Oberlin argues that Fenderson has failed to demonstrate a genuine issue of material fact with respect to whether: (1) the verbal warning she received in March 2013

---

are entitled to summary judgment on these claims.

constituted an adverse employment action; and (2) there was a causal connection between her decision to file suit in this case and the verbal warning.  Oberlin's arguments are well taken.  The record reflects that, after Fenderson filed a grievance in March 2013, Oberlin eventually agreed to remove the verbal warning from her file.  (Ex. 39 to Plaintiffs' Depositions, Doc. No. 59-8 at 223.)  Plaintiffs offer no evidence that the verbal warning has adversely affected her employment at Oberlin, particularly in light of the fact that the record reflects that Oberlin agreed to remove the verbal warning from Fenderson's file.  Accordingly, there is no genuine dispute regarding the third prong of the prima facie case.

Further, Plaintiffs offer no evidence of a causal connection between Fenderson's decision to file suit in this matter and the verbal warning.  In their opposition, Plaintiffs point to the deposition testimony of Pat McDowell, and contend that McDowell testified that other Oberlin employees were not issued discipline for the type of conduct that resulted in the March 2013 verbal warning.  (Doc. No. 73 at 36-37.)  Plaintiffs, however, have not provided this Court with a copy of McDowell's deposition transcript.  Accordingly, there is no evidence of a causal connection between the March 2013 verbal warning and Fenderson's protected activity in this case.  Oberlin is entitled to summary judgment on Fenderson's claim of retaliation under Chapter 4112.

**C.    Whether Defendants are Entitled to Summary Judgment on Plaintiffs' Remaining Claims**

In addition to their Chapter 4112 claims, Plaintiffs assert causes of action for breach of contract; negligent hiring, supervision and retention; and "severe emotional distress."  (Amended Complaint, Doc. No. 31.)  Defendants are entitled to summary

judgment on each of these claims as well.

### 1.    Breach of Contract

The contours of Plaintiffs' breach of contract claim are not entirely clear.  With respect to the claim, the Amended Complaint asserts:

> Further, Oberlin College has a Business Conduct Policy and Manual; and a Sexual Offense Policy; that each constitutes a separate contract between the College and its employees to guarantee the employee have not been put in an abusive environment.  The College has failed to follow its own policies and procedures.  The College has breached those contracts with all Plaintiffs by allowing sexual harassment to continue after it was reported and to this day.

(Doc. No. 31 at ¶ 19.)  In their opposition to the motions for summary judgment, Plaintiffs assert that, "Defendants are liable to plaintiffs for breach of contract to make them safe and free from sexual harassment and June 2010 [*sic*] incident."  (*See, e.g.,* Doc. No. 73 at 38.)  Plaintiffs continue:

> In this case it was reasonable for Plaintiffs to believe they could trust the Ombudsman's office to help and investigate the hostile work environment.  YB's yearly appeals to employees to come and see her along with the employment policies of the defendants created a contract to make Plaintiffs safe for which defendants are liable in breach.

(*Id*. at 39.)

As a preliminary matter, this Court concludes that Plaintiffs did not assert a breach of contract claim against Defendants Bon Appetit and Holliday.  The claim set forth in their Amended Complaint clearly identifies Oberlin as the sole defendant with respect to that claim.  Further, Plaintiffs have offered no evidence that Bon Appetit and Holliday entered into any contract with Plaintiffs.  Accordingly, to the extent that Plaintiffs contend – in their opposition to the motions for summary judgment –  that Bon

36

Appetit and Holliday are liable for breach of contract, those claims fail as a matter of law.

Plaintiffs' claims for breach of contract against Oberlin also fail.  Plaintiffs' allegations and arguments appear to assert that Oberlin's policies and YB's invitation to employees to contact the ombudperson's office constituted an enforceable agreement that Oberlin would protect Plaintiffs from sexual harassment.  Plaintiffs point to no legal authority to support their argument that, under Ohio law, an employer's sexual harassment policies – or an individual official's invitation to address employee complaints – constitutes an enforceable contract.[17]  Research reveals no Ohio decision concluding that a policy intended to address and prevent sexual harassment creates a contract right to be protected from that harassment.  *See, e.g., Skalka v. Fernald Envtl. Restoration Mgmt. Corp., 178 F.3d 414, 423 (6th Cir. 1999)* (noting that, under Ohio law, "an employer's general policy statements . . . are usually not sufficient by themselves to create an implied contract . . . ").  Absent any legal basis for this argument, Oberlin is entitled to summary judgment on Plaintiffs' claims for breach of contract.

### 2.    Negligent Hiring, Supervision and Retention

Plaintiffs contend that all Defendants are liable for the negligent hiring,

---

[17] In their opposition, Plaintiffs quote extensively from *Hartnett v. Papa John's Pizza USA, Inc.*, 912 F. Supp. 2d 1066 (D. New Mex. 2012), a decision by the United States District Court for the District of New Mexico, in which the court interpreted New Mexico law with respect to whether a supervisor's comments could create an implied contract that employer would discharge an employee only for cause.  Given that the present case involves Ohio law and the issue is not an agreement for continued employment, that case is not relevant to the analysis in this matter.

supervision and retention of Holliday.[18]  Under Ohio law, the elements of a claim for

negligent hiring, supervision and retention are: (1) an employment relationship; (2) the

employee's incompetence; (3) the employer's actual or constructive knowledge of such

incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and

(5) the employer's negligence in hiring, supervising or retaining the employee as

proximate cause of the plaintiff's injuries.  *Evans v. Ohio State Univ.*, 680 N.E.2d 161,

171, 112 Ohio App.3d 724, 739 (Ohio App. Ct. 1996).

      Holliday argues that a claim for negligent hiring, supervision and retention

cannot lie against an individual employee.  Plaintiffs point to no authority that holds

otherwise.  Further, this Court cannot fathom how an individual may be liable for his

employer's negligence in hiring, supervising or retaining him.  Accordingly, Holliday is

entitled to summary judgment on Plaintiffs' claims for negligent hiring, supervision and

retention.

      Oberlin argues that, because it was not Holliday's employer, it cannot be liable

for negligent hiring, supervision or retention in this case.  Plaintiffs do not assert that

Holliday was an Oberlin employee.  Nor do they offer any evidence of an employment

relationship between Holliday and Oberlin.  Further, Plaintiffs point to no legal authority

holding one entity liable for the negligent hiring, supervision or retention of the

---

[18] In their opposition to the motions for summary judgment, Plaintiffs also contend – for the first time – that Defendants are liable for the negligent hiring, supervision and retention of the "Oberlin College employee in the 'old boys club.'" (*See, e.g.,* Doc. No. 73 at 40.)  As discussed above, Plaintiffs' allegations regarding the "old boys club" are primarily based on the deposition testimony of Higgins, who was unable to describe the conduct of the "old boys club" with any specificity.  Accordingly, Plaintiffs offer insufficient evidence to support any claim based on the conduct of individuals other than Holliday in this case.

employee of another entity.  Accordingly, Oberlin is entitled to summary judgment on Plaintiffs' claims for negligent hiring, supervision and retention.[19]

Bon Appetit argues that Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to whether it had knowledge of Holliday's alleged incompetence.  This argument is well taken.  Plaintiffs point to nothing in the record that establishes that Bon Appetit was aware of Holliday's alleged propensity to engage in harassment.  Three of the Plaintiffs conceded at deposition that they did not notify Bon Appetit of Holliday's alleged conduct.  (Fenderson Dep. at 385:6-20; Altenburger Dep. at 387:5-18; Ault Dep. at 269:8-20.)  In short, Plaintiffs have failed to establish that Bon Appetit knew or should have known that Holliday was allegedly sexually harassing the Oberlin employee with whom he worked.  Accordingly, Bon Appetit is entitled to summary judgment on Plaintiffs' claims for negligent hiring, supervision and retention.

### 3.    Intentional Infliction of Emotional Distress

Under Ohio law, in order to prevail on a claim of intentional infliction of emotional distress,[20] a plaintiff must show that: (1) the defendant intended to cause

---

[19] Plaintiff generally assert that Oberlin is liable because it negligently retained Bon Appetit and Holliday as independent contractors after learning of Plaintiffs' allegations.  Plaintiffs, however, offer no factual or legal analysis to support this argument.  It is well-established that "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." McPherson v. Kelsey, 125 F.3d 989, 995–996 (6th Cir.1997).  Accordingly, the Court declines to consider this argument.

[20] In their Amended Complaint, Plaintiffs label their final count "severe emotional distress."  (Doc. No. 31.)  Review of the allegations in the Amended Complaint and in Plaintiffs' opposition, however, reveals that Plaintiffs allege claims for intentional infliction of emotional distress.

emotional distress to the plaintiff, or knew or should have known that his actions would result in emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the proximate cause of the plaintiff's psychic injury; and (4) the plaintiff's mental anguish was of a nature that no reasonable person would be expected to endure it. *Tschantz v. Ferguson*, 647 N.E.2d 507, 513, 97 Ohio App.3d 693, 702 (Ohio App. Ct. 1994). Ohio courts employ a high standard for claims of intentional emotional distress, requiring the plaintiff to demonstrate that the relevant emotional injury was "serious" and "severe and debilitating." *Cherney v. Amherst*, 584 N.E.2d 84, 85 66 Ohio App.3d 411, 413-14 (Ohio App. Ct. 1991). Generally, Ohio courts hold that, where a plaintiff offers no evidence that she sought medical or psychological treatment for the alleged emotional injuries, summary judgment in favor of the defendant is appropriate. *See, e.g., Crable v. Nestle USA, Inc.*, No. 86746, 2006 WL 1555405,*9 (Ohio App. Ct. June 8, 2006); *Buckman-Pearson v. Brannon*, 822 N.E.2d 830, 159 Ohio App.3d 12 (Ohio App. Ct. 2004); *Plikerd v. Mongeluzzo*, 596 N.E.2d 601, 73 Ohio App.3d 115 (Ohio App. Ct. 1992); *Sheets v. Rockwell Int'l Corp.*, 588 N.E.2d 271, 68 Ohio App.3d 345 (Ohio App. Ct. 1990).

　　　　In their opposition, Plaintiffs generally contend that Defendants' conduct "resulted in emotional distress," such that Plaintiffs "cried and were hysterical," and sought medical treatment for anxiety and depression. (*See, e.g.,* Doc. No. 71 at 23-24.) In their discovery responses, however, Plaintiffs stated that they had not sought any such treatment: "None of the Plaintiffs has sought medical treatment for any of the allegations in the complaint or amended complaint." (Plaintiffs' Discovery Responses,

40

Doc. No. 61-3.)  Further, during their depositions, Plaintiffs Ault, Altenburger and Bowen denied seeking any treatment from any medical or mental health provider for injuries related to Holliday's conduct.  (Altenburger Dep. at 226:18-22; Ault Dep. at 236:8-14; Bowen Dep. at 74:15-22.)  While Fenderson testified to receiving treatment – including prescription medication – for anxiety, she conceded at deposition that her medical records made no mention of workplace stress, and that much of her treatment predated the June 2010 incident in the cooler.  (Fenderson Dep. at 294:1-307:2.)  Accordingly, Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to whether any of Defendants' conduct caused them the type of serious, debilitating emotional injury necessary to prevail on a claim of intentional infliction of emotional distress.  Defendants are entitled to summary judgment on these claims as well.

### 4.    Punitive Damages

Plaintiffs seek punitive damages in their Amended Complaint.  Under Ohio law, however, "proof of actual damages in an underlying cause of action is a necessary predicate for an award of punitive damages."  _Moskovitz v. Mt. Sinai Med. Ctr._, 635 N.E.2d 331, 342, 69 Ohio St.3d 638, 650 (Ohio 1994).  Because Defendants are entitled to summary judgment on each of Plaintiffs' underlying claims in this matter, Plaintiffs cannot demonstrate that they are entitled to punitive damages under Ohio law.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are

GRANTED.


**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 26, 2014

42